89 Cal.Rptr.2d 449 (1999)
75 Cal.App.4th 657
The PEOPLE, Plaintiff and Respondent,
v.
Leo Adam SOMERSALL, Defendant and Appellant.
In re Leo Adam Somersall on Habeas Corpus.
No. A081134.
Court of Appeal, First District, Division Four.
September 30, 1999.
As Modified on Denial of Rehearing November 1, 1999.
Review Denied January 13, 2000.[*]
*453 Stephen B. Bedrick, Oakland, for Appellant.
*454 Jeremy Friedlander, Office of the Attorney General, First District Appellate Project, for Respondent.
SEPULVEDA, J.
In No. A081134, Leo Adam Somersall timely appeals from a judgment of conviction, after a jury trial, of the second degree murder of Rigoberto Enrique Garcia (Garcia), and the robbery and assault by means of force likely to produce great bodily injury of Israel Garcia Colchado (Colchado). Appellant contends that the judgment must be reversed because: the jury engaged in prejudicial misconduct; a videotaped statement to the police in which he admitted stabbing Garcia was the tainted fruit of an earlier statement that was found to have been involuntary and obtained in violation of Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (Miranda); his arraignment was improperly delayed in order to give the police time to obtain the videotaped statement with proper Miranda warnings; a purported confession by appellant that he personally robbed Colchado was erroneously admitted for the first time on rebuttal; and the trial court improperly excluded exculpatory evidence and erred in its instructions to the jury. In particular, citing our Supreme Court's recent decision in People v. Mendoza (1998) 18 Cal.4th 1114, 77 Cal.Rptr.2d 428, 959 P.2d 735 (Mendoza), appellant contends it was error to instruct the jury on an aiding and abetting theory of liability as to the aggravated assault upon Colchado, along with other instructionsemphasized by the prosecutor in closing argumentall of which clearly suggest that voluntary intoxication could not be considered with respect to the assault charge in this case. Somersall also contends that the case should be remanded for resentencing because the trial court denied a motion to dismiss a prior "strike" based on erroneous information.
In a petition for habeas corpus, No. A086816, Somersall presents additional arguments relating to his claim that his arraignment was improperly delayed so detectives could obtain a properly cautioned confession. In addition, he claims his attorney in a 1993 prosecution rendered ineffective assistance by advising him to plead guilty to two "serious or violent felonies" arising out of an assault with a deadly weapon and a battery with great bodily injury upon two separate victims in what he describes as a "continuous incident." He also raises claims under the ex post facto and due process clauses of the state and federal Constitutions based on his prior guilty plea. Finally, he makes a claim of factual innocence of the murder of Garcia, asserting that a separately charged co-defendant was solely responsible for Garcia's death.
We conclude the trial court properly rejected appellant's claim that his videotaped statement to the police was the tainted fruit of the earlier, suppressed statement. We further conclude that appellant has not, on the present record, established grounds for suppression of his videotaped statement based on the delayed arraignment in this case. Nor has he presented any claim of error warranting reversal as to the robbery of Colchado. However, we agree with appellant that the People have not overcome the presumption of prejudice arising from the jury misconduct in this case, insofar as it affected the verdict on count one for the murder of Garcia. Indeed, in a series of depositions of the twelve jurors, the trial court adduced evidence clearly establishing that at least one holdout juror was persuaded to vote for conviction on a theory of second degree murder, instead of some form of manslaughter, based upon an erroneous definition of "malice" found in a legal dictionary that was provided to the jury by the bailiff without the knowledge or approval of the trial court. We also agree that the conviction on count three, for the aggravated assault upon Colchado, must be reversed because of instructional error of the type identified in Mendoza.
*455 Accordingly, we will affirm the judgment of conviction as to count two (for the robbery of Colchado), reverse the judgment of conviction as to counts one and three, vacate the sentence imposed,[1] and remand for further proceedings consistent with this opinion. Given our decision on his appeal, we need not reach the issues raised in appellant's habeas corpus petition, No. A086816, and the petition is, therefore, denied as moot.

I. FACTUAL AND PROCEDURAL BACKGROUND
Based on the evidence set forth below, Somersall was found guilty of the robbery and assault by means of force likely to produce great bodily injury of Colchado, and the second degree murder of Garcia, all of which occurred on September 22, 1996.

A. The Fatal Stabbing of Garcia.

Shortly before midnight on September 21, 1996,[2] Garcia and Colchado were walking into the town of Hopland to buy beer, accompanied by two friends and fellow farm laborers, Timoteo Lopez (Lopez) and Fernando Gutierrez (Gutierrez). The four men, who spoke little or no English, chose a route along railroad tracks just to the west of a cluster of cabins.
Appellant, who was 31 years old at the time, was staying in one of the cabins (No. 5) with his 30-year-old sister, Charlene Somersall, and her three small children. Also residing in the cabin were two teenagers, 17-year-old Kenny Faber and 16-year-old Kimberly Faber. Also present on the night of September 21 were two other teenaged girls, 15-year-old Veronica Faber and 16-year-old Jennifer Faber, and another of appellant's sisters, Karen Casillas. Jennifer and Veronica were cousins of Kenny and Kimberly,[3] and lived in cabin No. 2.
Veronica testified that appellant was on the porch of cabin No. 5 with her, Kimberly, Kenny, and Jennifer, as the four farm laborers were walking along the railroad tracks. Charlene and her children were asleep inside the cabin. People were drinking Budweiser beer near the porch. Appellant was not wearing a shirt. Although Veronica gave conflicting testimony about how the incident began, she told the police that appellant wanted to get the attention of the four men so he and his companions could "jack" them, i.e., rob them for beer money. At appellant's suggestion, Veronica whistled to the men.
The first of the men to approach was Colchado, who was wearing a white cowboy hat. Initially, the other three men remained behind, stopping on the other side of a ditch between the railroad tracks and the cabins. Veronica and Kenny walked over toward the other three men and asked if they were going to come over and join their friends. Veronica spoke in English, and the men did not appear to understand her. At that point, Karen was standing by Colchado. Karen said she was going to the store, and asked Veronica to go with her. Veronica agreed and she, Karen, and Colchado began walking to the store. As they left, one of the other men *456 was coming across the ditch, leaving the other two behind. The man who tried to cross fell in, and was just sitting there. Gutierrez testified that the man who fell was Garcia. Gutierrez and Lopez crossed later.
After Karen, Veronica, and Colchado left the area, a fight ensued between appellant and Gutierrez and, possibly, others. Gutierrez testified that the fight began after one of the women started talking to him and Lopez, in a tone suggesting she wanted them to leave. Garcia was not far away from Gutierrez. The woman looked drunk or drugged. Gutierrez denied that he or any of the other men made any sexual advances toward the woman. Gutierrez said neither he nor Lopez was armed.
According to Gutierrez, a well-formed, slightly heavy man appeared from behind the house. The man was not wearing a shirt and was slightly shorter than Gutierrez, who is five feet, five inches tall. Gutierrez said appellant looked like this man. A second malewho was thinner and taller, with longer hair, and who was wearing a blue shirtwas also present.[4] Gutierrez approached appellant and extended his hand in greeting. Instead of shaking hands, appellant hit Gutierrez in the head. The two fell to the ground and struggled for two or three minutes, with appellant on top of Gutierrez. Suddenly, appellant got up and ran toward the fence leaving behind Gutierrez, who was bruised but not bleeding. Gutierrez did not see Garcia at that time, and Lopez had by then run away. Gutierrez saw no other fighting before or after this, and saw no one with a knife. Gutierrez said this altercation took place near a tree in front of an apartment, apparently, cabin No. 4. Appellant claimed the fight with Gutierrez occurred near cabin No. 5.
The evidence of what happened next was in sharp conflict. In a statement to police on September 24, appellant said that Garcia ran away toward a school bus just west of a fence along Highway 101. Appellant went after Garcia, and kicked him in the face. The two "might've had a few rounds." Kenny and someone else jumped on Garcia, but appellant did not remember who the other man was. Kenny might have been at the bus, but appellant did not remember what happened there. Appellant may have kicked Garcia several times near the fence.
During his September 24 interview with the police, appellant admitted stabbing Garcia, at first saying he "stuck" Garcia near his cabin. Later in the interview, however, appellant said he stabbed Garcia "[a]t least like two or three" times "in the upper right shoulder chest area," and then went back to his cabin while Garcia was lying near the fence. Appellant said he did not remember how "we" got to the fence. He claimed he, Kenny, and Garcia were alone near the bus, and that he did not hear anyone telling him to stop. Appellant said Kenny was still there when he left. Appellant subsequently told someone to go out by the fence and get Kenny.
Appellant said he did not know how he got the knife, but thought someone had handed it to him while he was near the school bus. Appellant did not believe he had seriously injured Garcia because he had used a knife with a three and one-half inch blade, which he thought was too small to reach any major arteries. Appellant said the knife may have had a red handle.
At some point during this fight, appellant suffered a facial cut, possibly from a "grape knife" later found by the police near appellant's cabin. In his September 24 statement to the police, appellant appeared to be claiming he was cut by Garcia at the very beginning of the fight, right after Gutierrez approached. Appellant claimed he did not see a knife until it cut him. Appellant said he responded by grabbing Gutierrez's neck, slamming his head to the ground, and kicking him.
*457 Appellant claimed that after he returned to the cabin, he washed his cut and did not go back outside again that night. He said that, as he was washing up in the bathroom, he folded the knife he had used to stab Garcia, and last saw it next to the sink. Thereafter it disappeared.
Gutierrez testified that after his fight with appellant, he got up and went toward a parking area near a laundromat, which was south of the cabins and close to the store to which Colchado, Karen and Veronica had gone. Gutierrez met Lopez there. The two men walked toward the road, where they thought Garcia had gone. Standing on the side of the fence nearest the road, they heard groans coming from the other side of the fence. They kicked down a three-foot section of the fence and found Garcia on the ground, between the fence and the easternmost of the cabins, cabin No. 1, which was six to nine feet from the fence.
Unable to revive Garcia, Gutierrez and Lopez returned to the area of the laundromat, near the railroad tracks. There they saw Colchado, perhaps accompanied by two women, carrying some packages. Gutierrez and Lopez tried to warn Colchado that Garcia had been killed, but Colchado may not have heard them and, in any event, paid no attention to the warnings. Gutierrez and Lopez then left to go back to their camp, and to tell Garcia's brother what had happened.
Alice Monk was a prosecution witness who lived with her husband and two children in Hopland in a house west of cabin No. 5, east of Highway 101, and north of the bus, the T-shirt stand, and the spot where Garcia's body was found. At about 1:30 a.m., Monk was awakened by a crash coming from the area of the T-shirt stand and the area in which the fence was found broken. She probably heard the T-shirt racks falling at this point, and did not hear any other crashing sounds. She looked out the window, but was unable to see because the bus was blocking her view. For 15 or 20 minutes, she heard a lot of noise, and thought a fight was occurring near the T-shirt stand. She heard voices, but could not distinguish what was being said.
Monk's husband called 911, then went outside to find the owner of the T-shirt stand, Jay Nealis, who came out of the bus. Monk stepped out onto her porch, but Nealis told her to get back into the house, which she did. At that point, Nealis got into his van and drove away heading north on Highway 101. Nealis returned about 15 minutes later. After the commotion outside ended, Monk heard a female voice yelling for "Jennifer" several times. The voice seemed to be coming from the area of the fight, but Monk could not tell if it was an adult or a minor yelling.
Monk's husband found Garcia and told Monk to call 911 again, which she did from a pay telephone near the T-shirt stand. At this point, Monk saw two young women, probably minors, walking south along the east side of Highway 101 toward the gas station and store. It was then approximately 1:45 a.m. As Monk hung up the phone, the first police officer arrived and detained the young women. Monk attended to Garcia, who was lying on his back close to the fence, south of the T-shirt stand and east of cabin No. 1. The T-shirt racks were knocked down, as was part of the fence. Garcia was wearing a dirty white T-shirt, which was hiked up, revealing his stomach, but Monk saw no camouflage jacket. Garcia's face was beaten and bloodied, and there were knife wounds to his throat, chest, and abdomen, from which his intestines were protruding. Garcia was unresponsive and was gurgling as he breathed. He was dying.
An autopsy performed on Garcia showed he suffered bruises on his face, an abrasion over his nose with a wavy "herring-bone" pattern indicative of the tread from a shoe that could have been Kenny's but not appellant's. These injuries would have taken several days to heal, but were not serious enough to cause hemorrhaging or fractures. *458 The coroner also found 15 knife wounds, all of which were consistent with a single weapon that could have been the red-handled knife, but not the grape knife. Four of the wounds were particularly serious: wound eight, which perforated the chest wall and diaphragm and produced a lot of bleeding into the abdominal cavity; and wounds eleven and twelve, which perforated the left abdominal wall and caused the intestines to protrude from the abdominal wall; and wound thirteen, which perforated the left abdominal wall and produced hemorrhaging near the pancreas. Garcia also had two defensive wounds: an incision on his left middle finger and a stab wound to his arm. Garcia's blood alcohol level was measured at .22 percent.

B. The Robbery of and Assault Upon Israel Colchado.

Colchado testified that when he went to the store with Veronica and Karen, he bought a 12-pack and an 18-pack of beer and some cigarettes, paying for the items with a $50 bill. He had more than $100 with him. He said he bought nothing for the two women; they did not want anything. However, Veronica testified that Colchado also bought ice cream and soda for her. Veronica said that Colchado was drunk, and that she saw him stagger. After making their purchases, Colchado and the women headed back toward the cabins. As they walked, Veronica saw two men near the laundromat who might have been Mexicans. When they reached cabin No. 5, Veronica went inside the cabin while Colchado waited outside, about 15 feet away. Veronica placed the ice cream in the freezer and put the beer on the floor next to the door of the bedroom Kimberly and Kenny shared.
Colchado testified that he was about to leave the area when a man blocked his path and assaulted him. Suddenly, blows were falling on him from all sides. Although he never saw more than one assailant, he thought there had to be more than one. He was on the ground, face down, yelling, and felt kicks all over the place. Blood came out of his nose and mouth. The kicking stopped after a woman yelled something, and he then felt hands going through his pockets. He lost about $100 and a $50-dollar check. He got up and, with his head spinning, walked unsteadily back to the labor camp. The next day he was so sore, he could not get up. He worked in spells, but only because he had to work in order to eat. At the time of trial, his ribs still did not feel right, his eyes hurt, and his vision remained cloudy. Photographs taken on Monday, September 23, showed an injury to Colchado's right eye and an abrasion on his shin and knee.
A resident of cabin No. 4, Santos Andrade, also testified about the robbery of Colchado. Andrade said he was awakened on the night of September 21, by a noise behind the house. Cabin No. 4 was approximately 34 feet southwest of cabin No. 5. Looking through his window toward cabin No. 5, Andrade saw Colchado wearing a Texas-style hat and walking toward cabin No. 5. Colchado appeared drunk. Colchado reached the door of cabin No. 5, but did not go in. A man Andrade knew as a resident of cabin No. 5 came out of the cabin accompanied by another male, a boy of 16 or 17 whom Andrade had seen daily around the cabins. Andrade identified the first man, who had long hair and wore no shirt, as appellant. The younger man had more "normal length" hair. Andrade said appellant started the assault on Colchado, yelling at him, and pushing and hitting him. Andrade did not understand what was said because appellant was yelling in English. Appellant and the younger man, joined by two or three women from cabin No. 5, continued the assault for a minute or two, knocking Colchado down and kicking him. Then the assailants went back inside their cabin, and Colchado left. Andrade did not see anyone go into Colchado's pockets, but he could not see what each person was doing all the time.
Veronica testified that she did not see the beginning of the fight, but she did see *459 Colchado on the ground, trying to cover his face, and saw appellant kick Colchado a total of 30 or 40 times. Everyone was "running around," and Kenny was kicking and beating Colchado, too, but not as much as appellant. Karen was standing about eight feet away during the beating. Aided by Kenny, Karen went through Colchado's pockets. Appellant turned Colchado over and Karen went through his back pockets. Someone was saying "Get the money, get the money." At first, Veronica said the speaker was Karen, then later said she did not remember whether the speaker was a male or a female.

C. The Police Investigation at the Crime Scene.

Mendocino County Deputy Sheriff Craig Keiser arrived on the scene at 1:37 a.m. on September 22. Keiser was met by Monk, who told him a man had been badly stabbed. He saw three people moving to the south, but was only able to detain twoKimberly and Jennifer. The third person appeared to be shorter and wider than the two girls, but he could not tell the person's gender. The person seemed to have been conversing with the girls. At trial, the prosecutor theorized that this person was Charlene, who is five feet, one inch tall.
After putting Jennifer and Kimberly in his patrol car, Keiser attended to Garcia for about five to ten minutes before emergency personnel arrived. Garcia was unresponsive, he stared blankly, and his breathing was labored. Garcia was wearing a white T-shirt and a camouflage jacket. Keiser only saw the emergency personnel remove the T-shirt, but he collected both articles of clothing from Garcia. The police interviewed Jennifer and Kimberly on the morning and afternoon of September 22. The interviewer saw no injuries on the girls, and the girls pointed out none.
Detective Frank Rakes arrived at the scene at 2:30 a.m. on September 22. He found an eight-foot-long section of a six-foot-high fence knocked down in an out-ward direction, toward the road. Southeast of cabin No. 5, and southwest of cabin No. 6, Rakes found an area 15 feet in diameter in which there were several footprints, suggesting that a number of people had been there and that a struggle had occurred. In this area, Rakes found an unopened pack of Marlboro cigarettes. He also found two rocks with blood on them. From the fence where Garcia's body was found to the center of the 15foot-diameter area was approximately 117 feet. A series of blood drops had fallen near the rear (west end) of the school bus. On a rough line running in an eastward direction toward the 15-foot diameter area, was a series of blood spots. Southwest of the 15-foot diameter area, in front of cabin No. 4, Rakes found more blood on a chair and a bucket.
Detective Alvin Tripp arrived at the scene at 2:55 a.m. on September 22, met with Rakes, and surveyed the scene. Tripp returned later that morning, between 8:30 and 9:00 a.m., and found several adults and childrenincluding appellant, Charlene, and Karensleeping. Everyone was waking up as Tripp entered. Tripp observed blood on the floor and on a washrack. Appellant, Karen, and Charlene were taken to the detective's bureau.
From the roof of the porch on cabin No. 5, Tripp seized a grape knife with a reddish-colored stain on it. On the ground near that cabin, Tripp found a series of scuff marks, shoe prints, and what appeared to be blood. In this area, Tripp also found three white buttons. Colchado's shirt was torn and missing similar buttons.
Between 10 a.m. and noon, Tripp took photographs of appellant that showed injuries to his left cheek and left armpit areas. The cuts on appellant's face were consistent with those that would have been inflicted by a grape knife, and were not defensive wounds.
*460 On the evening of September 23, Tripp and Frank Pomilia, Kenny's probation officer, contacted Kenny in cabin No. 5. Tripp entered the bedroom and saw a red-handled knife underneath a dresser, but did not seize the knife at that time because they were looking for a black-handled knife. They left the red-handled knife on top of the dresser. They returned about an hour later, after Kenny was interviewed, and retrieved the red-handled knife, which had not been moved. Photographs taken of Kenny were not clear enough to determine whether a scratch on his neck and a cut on his back could have been inflicted with a grape knife.

D. Appellant's First Statement to the Police on Sunday, September 22.

Detective Tripp testified that at about 9 a.m. on Sunday, September 22, appellant voluntarily agreed to go with him to the detective's bureau. He was not handcuffed, and the investigators used no weapons. Tripp had no intention of arresting appellant at that time, and appellant was not told he was under arrest. Detectives Tripp and Forrester began to interview appellant sometime between 10 and 11 a.m. During the interview, appellant was not restrained in any way, and he was not told he was under arrest. There was conflicting evidence whether the door to the interview room was locked: Tripp said he walked into the room without unlocking the door and believed it was unlocked during the interview; appellant testified that the detectives locked the door when he was first put in the room, and that he tried without success to open the door.
A transcript of the interview is 36 pages long. Half-way through the transcript, at page 18, Tripp gave appellant Miranda warnings. It was then approximately 12:15 p.m., an hour and five minutes after the interview began.
On pages 2 through 14 of the transcript, appellant tells the following story in response to short, nonaccusatory questioning by the detectives: Two Mexicans in a group of more than 5, and possibly as many as 10 or 12, started arguing and fighting near cabin No. 4. Appellant was with six other people on the porch of cabin No. 5. He tried in vain to get the Mexicans to leave. Someone cut him on the shoulder by swinging at him once with a grape knife. As the fight continued, appellant went inside to try to stop the bleeding and wash up. The wound was not bleeding badly; he was just grazed. When he finished washing up, the Mexicans were gone.
On page 15 of the transcript of the first interview, the tone becomes more accusatory when Detective Tripp says: "But now we've got to get down to the truth. You're not telling me the truth. Karen's not telling me the truth. Charlene's not telling me the truth, (inaudible) not telling me the truth. I have a dead Mexican right out in the front yard where you were sleeping. It appears to me that there's a conspiracy involved in this murder by all of them.... And it appears to me that they're also trying to cover up and help to protect someone. Do I put everyone in for murder because I can prove that you're saying everyone else is involved is lies? I know for a fact they went to the store and bought beer (inaudible) [and] within ten minutes from coming back from the store (inaudible) the fight occurs (inaudible) and the man gets killed. Now I need the truth. You want to ... do we want to drag everybody into it, everybody stand trial[,] or do we just want to get down to the fact that two people ended up in a fight and somebody got accidentally killed? This is where the truth ... this is where (inaudible) young ladies and older ladies can get drug into it big time."
Appellant responded to Tripp's speech by simply repeating the story he had told. Plainly dissatisfied, Tripp again pressed appellant to reveal more information, saying: "Maybe you should reconsider because, you know, I know you were out there. I know you [were] involved in the fight. Nobody else was (inaudible) but this Mexican's dead, (inaudible) I know *461 about the chase around the yard and the (inaudible) and three the board fence and back over it. And while the chase was going on footprints were left on the board from the dirt on the bottom of the soles. Uh, I want you guys to really consider about what I just said. And because you're going to be dragging in some very young girls that are going to end up in deep caca. You're dragging Karen and Charlene into it big time. Karen is (inaudible). And Veronica[,] she's up a creek too without a paddle. So I'm going to step out of here and so is Darrell here for a bit and give you a few minutes to think about it. `Cause then I'm going to come in and ask you again for an official statement and at that time I may be bringing a tape recorder in, okay. So please consider what I've said. If you've got into an altercation or a fight and this guy got accidentally got hurt[,] it's a hell of a lot different than somebody being murdered and everybody trying to cover up.... [¶] `Cause it only makes it look worse than what it is. If the guy took a knife after you[,] it's different. You have a right to self defense if some (inaudible). Please consider what I said because it could be something minor turn out to be something big and with your record it's going to hurt you big time boy."
After this second speech, Tripp and Forrester left the room. They returned at 12:11 p.m. and gave appellant Miranda warnings. However, appellant agreed to continue talking to them. Appellant's story did not change appreciably: He said two Mexicans started fighting with one of the men from a neighboring cabin. Veronica screamed at appellant to make the Mexicans leave. Appellant "went over and tried to get them out of here" by pushing back one of the Mexicans. Appellant fought with the Mexican for about 10 minutes, punching him. Then another guy swung at appellant with a grape knife and cut him on the face and shoulder, causing him to lose a lot of blood. Appellant then went inside to wash up. Several of the Mexicans drove off in a car. About fifteen minutes later, Karen and Charlene walked to the store for a case of Budweiser in cans. Appellant claimed this was the whole truth, that he was not leaving anything out. He said he saw no one wearing a white cowboy hat.
Told that his statement did not agree with the other information the interrogators had and that, therefore, they would have to arrest him, appellant said, "You think if I had anything to do with it I'd stick around?" Appellant could not explain how a grape knife came to be found in his home, or why the blood on it belonged to the victim. He asked Tripp and Forrester if they were also arresting Karen and Charlene, but their reply was inaudible. Asked if he would be able to explain if the blood on his shoes belonged to the victim, appellant admitted having kicked the victim in the side after he was cut. Appellant said the victim was standing when he kicked, and never fell down. Appellant said he himself fell down when he was cut. At the end of the interview, appellant again asked if Karen was being arrested. Tripp answered that he did not know. At the end of the interview, appellant was told he was being placed under arrest.
Appellant moved to suppress this first statement September 4, 1997. The motion was granted in this respect by the trial court on September 15, 1997. In concluding that the first statement both violated Miranda and was involuntary, the trial court commented as follows: "[I]t's real clear that Tripp indicated he wanted to talk to the defendant as well as some others about the altercation. It was real clear that it took place in the sheriffs department, and although he wasn't under arrest, the transcript doesn't reflect whether or not he was advised he was free to leave or terminate the interview. I don't know if the door is locked or unlocked. All I have is conflicting testimony on the one hand that the defendant tried to push the door and couldn't get it open, [whereas] Tripp [was] indicating that it *462 was not barred. There's no direct evidence of any express restriction on his freedom. [¶] The interrogation; there's no reason for me to disbelieve, ... that from the time of its initiation until he is actually Mirandized is an hour and five minutes after Tripp's statement he had been waiting up to two hours before that. We've got two officers participating in the interrogation. [¶] And I'm struck by the fact that the officer during that interrogation repeatedly verbalized disbelief in his answers and that they manifested further a belief that he was lying and that he was not somehow coming clean, that he was fabricating some evidence here. [¶] I think they were confrontational. They certainly were accusatory. You know, you've read some statements in here just now in which they threatened to prosecute family members referring that if he talked, that they might find it was all an accident rather than anything premeditated. [¶] I mean, I don't have a problem as to the first series of questions from that hour and five minutes that finding, I think, both that Miranda was violated as well as the fact that he wasthat the statement that was made on that date was involuntary."

E. Appellant's Second Statement to the Police on Tuesday, September 24.

On the morning of Tuesday, September 24, appellant was again interrogated by the police, and again agreed to give a statement. A videotape of appellant's second statement was played for the jury at trial. Appellant was given full Miranda warnings at the beginning of the second interview.
Appellant told the police he had been drinking beer all day on the day of the incident. He said he had visited his mother, gone to a car show, returned home, and had more beer. He also drank 100-proof Schnapps and a pint of Bacardi rum. Just after dark, he was at Jennifer's cabin talking to Jennifer, her mother, and her brothers. He "had words with" the brothers and with Kenny.
Appellant did not mention anyone whistling at the four farm laborers as they walked along the railroad tracks, or otherwise trying to get their attention. He said he did not hear anyone say anything about "jacking" anyone. He said the men just "walked up" to the porch as he and his companions were sitting there, but he did not remember a man in a white hat at all. Appellant said he knew "a little bit" of Spanish, and understood the men to be using a lot of curse words. He said he did see Karen leave for the store with someone; he thought it was Charlene and Jennifer or Veronica. Appellant said one of the men precipitated an argument by "talking smart" and "rattling on about nothing." When appellant told them to leave, one of the men responded by pushing him. Appellant hit this man, who responded by cutting appellant in the face with a knife, which appellant did not see until he was cut.
The balance of appellant's second statement about the stabbing of Garcia is recounted in section LA, ante. Regarding the assault upon Colchado, appellant claimed he never hit or kicked the man in the white hat, and had no idea who did.
In his motion to suppress, filed September 4, 1997, appellant argued that this second statement had to be excluded at trial because it was tainted by the coerciveness surrounding the first statement. The trial court disagreed, saying: "[T]he stretch is much greater to find that that somehow carried over into the statements made the second day. [¶] Now I haven't heard testimony from anybody as to what took place that second day. The transcript that I have reviewed ... starts out with the Miranda warnings themselves. I don't know whether or not there was discussion prior to that.... But the fact that time has ... passed between these statements seems to me to militate against me finding that statements made on that second date were in violation either of Miranda *463 or were themselves involuntary statements as a result of some threat, coercion, or implied threats against the family." Accordingly, as we have noted, the videotape of appellant's second statement to the police was played for the jury at trial.

F. The Criminalistic Evidence.

Criminalist Toby Baxter performed three blood typing tests on samples from five people: appellant, Garcia, Colchado, Kenny, and Karen. Baxter discovered that appellant's and Karen's blood types were the same, so he did a fourth test to differentiate them.
Baxter typed seven stains from the right sleeve of Garcia's camouflage jacket, and found that three were consistent only with appellant's blood. Three other stains from other parts of the jacket were consistent with Garcia's blood. A stain above the right pocket of the jacket was also consistent with appellant's blood.
Baxter also typed seven stains from the leg of Garcia's pants, all of which were consistent only with appellant's blood. Four of those stains were "gravity drops" caused by blood dripping freely, perhaps from a cut, as close as two feet away. It was most likely that the drops fell from above as Garcia was lying on his back. Most of the blood stains on Garcia's clothing were on his right side.
A bloodstain taken from near the fence was consistent with Garcia's blood, but samples taken from the ground between the bus and the 15-foot diameter area were inconclusive. There were at least 20 bloodstains on the bucket found near cabin No. 4, 6 of which were consistent only with appellant.
Blood from the toe of one of appellant's shoes had been smeared or swiped there, and could have gotten there by his kicking. The blood on appellant's shoes was definitely consistent with Colchado's and, possibly Garcia's.
Some bloodstains on Kenny's pants were consistent only with his own blood. Others were consistent with appellant's and Karen's or appellant's alone. Garcia could not be excluded as the source of one stain for which Baxter got a partial result. Blood on the back of Kenny's black T-shirt was consistent with Kenny. A cut on the back of Kenny's shirt could have been caused by a grape knife, or the red-handled knife, or something other than a knife. Stains or smears near the cut were consistent with appellant's and Karen's blood.
Some stains on Colchado's shirt were consistent with Colchado or only with him. Three bloodstains on the back of Colchado's shirt were consistent only with appellant's blood. Two bloodstains on Colchado's shirt might have been a shoe-print transfer, and were consistent with the blood of Kenny, Colchado, or Garcia. The pattern was consistent with Kenny's shoes and also Kimberly's, but the source could not be definitively established. There was no blood found on Kenny's shoes. There was blood on Kimberly's shoes, but it was not tested. Wavy lines on Colchado's neck were insufficient to establish that they came from shoes. Some bloodstains found on Jennifer's shoes were too small to type. A blood stain found on one of the rocks collected from the 15-foot diameter area was consistent only with Colchado.
The blood on the handle of the red-handled knife came from at least two different people. The blood type of the major donor was consistent only with appellant, and none of the others who were tested. Appellant could also have been one of the minor donors. A weak partial result suggested a source different from all five people whose blood was tested. The blood from the blade of the red-handled knife came from at least three different sources. Among the five people tested, only Colchado could be eliminated as the source of the blood on the handle.

*464 G. The Defense Case.

The defense called Deputy Darryl Forrester, who transported Kimberly and Jennifer to Ukiah from the crime scene. He smelled alcohol on the breath of both girls, and one was laughing a lot.
Jay Nealis, the owner of the T-shirt stand, also testified for the defense. Nealis said he was sleeping in the bus on the night of September 21. He heard a scuffle below the bus, which lasted for five or ten minutes, and he assumed it was a fight. Nealis heard a male voice say, "I'll kill you. I'll kill you." The voice might have been that of a Hispanic male, and he may have been drinking. Nealis then heard a female voice say two or three times, "Stop it, you're going to kill him." After hearing these voices, Nealis had heard the fence breaking on top of one of the racks of his T-shirt stand. Scared and agitated, Nealis remained quiet in the bus. About three minutes after the fence was broken, Nealis got up and looked outside to the east and to the west, but saw nothing. Nealis then exited the bus on the north side and saw Monk standing on her porch. After a brief conversation with her, Nealis jumped in his van and drove north. He waited until law enforcement officers arrived before returning.
The main witness for the defense was appellant's sister, Charlene. She testified that, at the time of the incident, appellant had been staying with her and her children in cabin No. 5 for perhaps two days. Kenny was also living there. On Saturday, September 21, appellant and Charlene visited their mother in the hospital for two or three hours, went to a car show for a few hours, and returned home at approximately 4 p.m. Appellant smelled a little like beer at that time. At about 7 p.m., appellant argued with Veronica's brothers.
Charlene further testified that appellant went to sleep at about 8:30 p.m. because he was by then "pretty well drunk." He arose at about 10 p.m. when Kenny awakened him, and the two men went outside. Sometime before the two men went outside, Charlene heard a whistle. Remaining inside the cabin, Charlene heard Mexican people talking. She got up and saw three Mexican men in front of the porch. Kenny hit one of the men. Charlene did not know why, but thought Kenny might have been "drunk, too." Appellant helped Kenny by keeping the other Mexican men away. On cross-examination, Charlene said that appellant asked her for a knife sometime during this fight, and that he may have kicked or hit the Mexican guy.
One of the Mexican men left, moving to the west toward the area of cabin No. 4. The two others took out grape knives and were swinging them, trying to cut people. Kenny had one of the men on the ground. This man got up and ran toward the bus, pursued by Kenny, appellant, and the girls. However, appellant did not get far. He returned to the cabin and showed Charlene a pretty deep cut on his cheek. He and Charlene went into the bathroom, where Charlene helped him wash the cut. Appellant went back outside and asked Charlene where the others had gone. At this point, which was about five minutes after the chase started, Jennifer and Kimberly returned from the area of the bus, followed by Kenny. Kenny was carrying a grape knife, and his shirt was torn. Kenny said he had stabbed the guy, and that he thought the guy was dead. He put the knife above the rafter above the house. Charlene did not see the knife get washed. After Kenny and the girls returned, appellant and Charlene returned to the bathroom to wash appellant's cut again. At one point, Charlene said she heard the fence break after everyone had returned. However, she also said the fence was already broken when Kenny and the others ran over there.
Charlene also testified about the assault on Colchado. She said that when Karen and Veronica returned from the store with Colchado, Kimberly ran over to Karen and told her something. Karen came into the house to see appellant. Colchado, who *465 was wearing a white cowboy hat and appeared to be drunk, tried to follow. Kenny said something to Colchado in English. Looking at appellant's face, Karen got mad and, along with Kenny, went outside and chased Colchado. Kenny knocked Colchado to the ground, and Jennifer and Kimberly joined the fight. Karen was out there, too. The fight with Colchado took place between cabin Nos. 5 and 6, and lasted about four minutes. A lot of people were hitting and kicking Colchado. Appellant left the house when Colchado was already on the ground. Charlene was not sure what appellant did outside, but he probably hit Colchado a couple of times or perhaps just swung at him. Charlene said it was Veronica and Kenny, not Karen, who went through Colchado's pockets.[5] After Colchado left, appellant went into the house again. Charlene denied she was the person seen running away when Deputy Keiser first arrived on the scene. She claimed that she was in the house, and that it was Kenny who ran away.
When asked about her statements to the police, Charlene said she lied to the first officer she spoke to, telling him she had not heard or seen a fight. She also lied when she said she did not know how appellant got cut. In a subsequent interview, however, she told another officer she saw a fight among a Mexican guy, appellant, and Kenny. During her interviews with the police, Charlene did not tell them that when he returned after chasing the man over by the bus, Kenny had said he stabbed the guy and thought he was dead.
Based on the foregoing evidence, defense counsel argued that appellant and his companions were drunk and, thus, incapable of planning to rob the farm laborers. Appellant became involved after the men approached and, perhaps, made offensive remarks to the females. Defense counsel claimed that as appellant fought with Gutierrez, Garcia cut appellant in the face with a grape knife and that, at this point, appellant may have stabbed Garcia a couple of times, but not seriously. Kenny and the girls then fought with Garcia, and pursued him as he ran toward the fence. Appellant may have joined the chase, but never reached the fence because he discovered he was bleeding and returned to the cabin to treat his wounds. In the meantime, Kennyaided by Kimberly and perhaps one of the other girlswas stabbing Garcia to death by the fence. When Colchado returned from the store with Karen and Veronica, appellant was angry at having been cut by Garcia, so he assaulted Colchado. As such, defense counsel conceded appellant was guilty of assault and battery. However, he claimed appellant did not use force likely to produce great bodily injury and had no intent to aid in the subsequent theft and, thus, was not guilty of the robbery carried out by Karen and Veronica.

H. The Showing of Jury Misconduct During Deliberations.

A set of facts critical to our disposition of this appeal was developed by the trial court immediately after the jury returned its verdicts on the three counts alleged in the amended information and its findings on the special allegations. The verdicts and findings were entered on October 16, 1997, the fourth and final day of deliberations. Later that same day, the court learned that, in response to a request from the jury foreperson, the bailiff had provided jurors with a copy of Barron's Law Dictionary (3d ed.1991) p. 537.
The next day, the trial court called the jurors into chambers one by one, placed each of them under oath, and proceeded to question them about the incident.[6] Although *466 the jurors had varying recollections of the timing of the request for and review of the dictionary, and the effect it had on their deliberations, certain commonalities in their testimony emerged. All who had a specific recollection of what they were looking for said the purpose of the request was to clarify the meaning of the term "conscious disregard" for human life, as that term is used in the pattern jury instruction entitled "Malice Aforethought Defined" (CALJIC No. 8.11 (6th ed.1996)). In relevant part, that instruction provides: "Malice is implied when: [¶] The killing resulted from an intentional act, [¶] The natural consequences of the act are dangerous to human life, and [¶] The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (Ibid.)
It is also undisputed that the jury was unable to find the terms "conscious" or "conscious disregard" in the legal dictionary provided by the bailiff, and so turned instead to the definition of "malice," which reads as follows: "MALICE: [1] The state of mind that accompanies the intentional doing of a wrongful act without justification or excuse. [Citation.] It refers to [2] `an intent to cause the very harm that results or [3] some harm of the same general nature, or [4] an act done in wanton or willful disregard of the plain and strong likelihood that some such harm will result. [5] It requires also on the negative side the absence of any circumstance of justification, excuse or recognized mitigation.' [Citation.] [6] It denotes `a reckless disregard of human life which proceeds from a heart and mind devoid of a just sense of social duty and fatally bent on mischief.' [Citation.] [7] Blackstone first said that malice may be either express or implied in law. EXPRESS [ACTUAL] MALICE is that type of malice aforethought that includes an intent to kill. IMPLIED [CONSTRUCTIVE, PRESUMED] MALICE is a state of mind sufficient for murder but lacking in specific intent. It is inferred from the conduct of the actor and the injury which results. [Citations.]"[7]
Several of the jurors testified that they consulted the legal dictionary at a point in their deliberations at which they were divided on the homicide charge and, perhaps, on the robbery charge as well. Apparently, some jurors read the definition of "malice" to themselves, and one read the definition aloud to the whole jury. Shortly after the definition was read, the jury reached unanimity on verdicts of second degree murder, robbery, and aggravated assault.
The examination of one particular juror, No. 11, is particularly significant to our *467 analysis, and fairly typifies the inquiry the court conducted with the assistance of both the defense counsel and prosecutor.[8] The relevant portions of Juror No. 11's testimony in response to the court's questions, were as follows:
"Q. [By the Court] ... [I]t has come to our attention that something was requested by the jury just before you arrived, apparently, at some verdicts or a verdict. Can you tell me what was requested?
A. It was a legal dictionary.
Q. Who requested it?
A. I don't know. I just remember our jury was not run on a rules of order basis and there was a lot of talking going on. [¶] But it was because of me. I was the lastI was not understanding, or could notI did not feel that conscious disregard for human life was palatable for me to vote for murder 2. [¶] And everybody else had already come to the conclusion that it was fine, and I really feel badly about this, because I think we really all tried to do the best thing. I honestly felt that, to be fair, because I really did not think that that was pertinent to the way I felt about the case....
Q. What didn't you feel was pertinent?
A. There was an instruction in our instruction book that I could not vote yes the way the jury instruction set it up. It was conscious disregard for human life that had brought us to a standstill. [¶] And somebody I think suggested, `Is this all right?' That if a legal dictionary were brought in, maybe I would understand it differently; that maybe it didn'tmaybe my perception of it was not correct, seeing as eleven people had come to the conclusion that it was. [¶] And so at any rate I remember the dictionary came in, and another jury read it, and then I read it three or four times, and I was able at the time to pick out a few other definitions that made `malice' comfortable for me. Unfortunately, that was the end of it.
Q. How long after it was read did the jury arrive at their verdict?
A. Well, almost right away.
Q. Okay. And the one that was remaining and outstanding was which count?
A. Well, it was Murder 2.
Q. So the jury had arrived at verdicts on the other matters?
A. Yes. We had gone through them all, and it was more or less a formality then to take the final vote on the rest of them, which had actually been in discussion for a few days, also, but that seemed to be the stumbling block. And then that was it." (Italics added.)
The court also allowed defense counsel and the prosecutor to question Juror No. 11. The relevant portions of Juror No. 11's testimony in response to the attorneys' questions were as follows:
"Q. [By the Prosecutor]: ... [D]id the dictionary in any way affect your deliberations on any of the specials or any of the verdicts?
[DEFENSE COUNSEL]: [Objection based on Evidence Code section 1150.]
THE COURT: That will be denied. [¶] And your answer is?
JUROR [No. 11]: No.
THE COURT: Thank you. Anything else?
[PROSECUTOR] Q.: You said you read the legal dictionary, certain things, over a few times. What were the things that you read over?
[DEFENSE COUNSEL]: Same objection.
THE COURT: I think she has answered it, but I will allow her to answer it.
*468 JUROR [No. 11]: It was the whole definition of malice, but I think that was not what it was called.
THE COURT: Malice aforethought ?
JUROR [No. 11]: It wasn't malice aforethought.
[DEFENSE COUNSEL]: Objection; leading.
JUROR [No. 11]: There were two malices, and I can't remember. I went home and forgot everything, so I don't remember what definition we were reading, except this was the one that pertained to the case, not the other one.
[PROSECUTOR] Q.: Would it have been express or implied malice?
[DEFENSE COUNSEL]: Objection; leading.
[PROSECUTOR]: This is not a trial. I am just trying to clarify.
[DEFENSE COUNSEL]: This is totally, blatantly an improper hearing.
THE COURT: Stop. [¶] Do you understand his question?
JUROR [No. 11]: Yes, but I'm afraid I can't be more explicit. It was notit was the one you gave us a definition, which we should have stayed to; and it was implied malice or express malice, but it wasn't malice aforethought. I can't remember the actual words used."
On November 3, 1997, appellant filed a motion for new trial contending, inter alia, that both the bailiff and the jury had engaged in misconduct as established during the post-verdict hearing. The trial court agreed, but found the misconduct harmless on the theory that the dictionary definition of "malice" did not differ significantly from that contained in CALJIC No. 8.11.

II. DISCUSSION

A. The Trial Court Did Not Err in Finding That Appellant's Second Statement to the Police Was Not Tainted by the Involuntariness Associated With the First.

In a hearing on September 4, 1997, the trial court heard and decided appellant's claims that both of his interviews with the police should be suppressed, the first because it was involuntary and obtained in violation of his Miranda rights, and the second because it was the product of and tainted by the coercion associated with the first. Of course, appellant does not complain on appeal about the trial court's decision to exclude his first statement (taken on September 22, 1996) on both grounds asserted. He does, however, contend that the second statement (taken on September 24, 1996) was tainted by the involuntariness associated with the first, and that the trial court thus erred in admitting the statement into evidence. As set forth in section I, ante, this issue was fully developed in the record of the pretrial and trial proceedings below. Because it is likely to arise again on remand, we will first address the issue of the admissibility of appellant's second statement. (See People v. Wilson (1992) 3 Cal.4th 926, 937, 13 Cal. Rptr.2d 259, 838 P.2d 1212.)
The standards of review for a trial court's ruling on a suppression motion are well settled: "In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] `The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citation.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, ... is also subject to independent review. [Citations.]" (People v. Williams (1988) 45 Cal.3d 1268, 1301, 248 Cal.Rptr. 834, 756 P.2d 221.)
*469 The same standards of appellate review apply to a motion to suppress an incriminating statement or confession by a defendant on the grounds it was the product of police coercion: "A defendant's admission or confession challenged as involuntary may not be introduced into evidence at trial unless the prosecution proves by a preponderance of the evidence that it was voluntary. [Citations.] A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity. [Citations.] On appeal, we review independently the trial court's determination on the ultimate legal issue of voluntariness. [Citation.] But any factual findings by the trial court as to the circumstances surrounding an admission or confession, including `"the characteristics of the accused and the details of the interrogation" [citation],' are subject to review under the deferential substantial evidence standard. [Citation.] [¶] In deciding the question of voluntariness, the United States Supreme Court has directed courts to consider `the totality of circumstances.' [Citations.] Relevant are `the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as `the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' [Citation.]" (People v. Williams (1997) 16 Cal.4th 635, 659-660, 66 Cal.Rptr.2d 573, 941 P.2d 752; see also People v. Montana (1991) 226 Cal.App.3d 914, 931, 277 Cal.Rptr. 327 [where evidence regarding interrogation is uncontroverted, appellate court conducts independent review of issue whether involuntary confession tainted subsequent confession] (Montana ).)
The rules of law governing admissibility of a second confession by the defendant, in the face of a claim that it was tainted by involuntariness found to have infected a prior statement or confession, are also well settled: "In seeking to exclude evidence not directly obtained by illegal conduct, the defendant bears the burden of making a prima facie case that such evidence was "tainted" byi.e., causally linked tothe primary illegality. [Citations.] This burden also is heavy. He must show more than that the challenged evidence "would not have come to light but for the illegal actions of the police"; rather, he must establish that it "`has been come at by exploitation of that illegality....'" [Citation.] If the defendant makes this showing, the burden shifts to the prosecution to prove that the taint has been "purged" and hence that the evidence is admissible in spite of the primary illegality. [Citations.]' [Citation.] [¶] Incriminating statements by a defendant are admissible despite previous unlawful governmental conduct if they are `sufficiently an act of free will to purge the primary taint' [citation], or, phrased differently, if the connection between the illegality and the confession `had "become so attenuated as to dissipate the taint."` [Citations.] [¶] In Brown v. Illinois (1975) 422 U.S. 590 [95 S.Ct. 2254, 45 L.Ed.2d 416], where the issue was the admissibility of a confession taken after an illegal arrest, the high court said: `The question whether a confession is the product of a free will under Wong Sun [v. United States (1963) 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441], must be answered on the facts of each case. No single fact is dispositive.... The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of [the illegality]. But they are not the only factor to be considered. The temporal proximity of the [illegality] and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.' [Citations.]" (People v. Beardslee (1991) 53 Cal.3d 68, 108-109, 279 Cal.Rptr. 276, 806 P.2d 1311 (Beardslee), italics in original.)
In Montano, supra, 226 Cal.App.3d 914, 277 Cal.Rptr. 327, we applied the foregoing principles to hold that a second confession *470 by a defendant was rendered involuntary by the coerciveness of the conditions under which a prior confession was produced and, accordingly, reversed the defendant's conviction of first degree murder. (Id. at pp. 937-941, 277 Cal.Rptr. 327.) Appellant relies heavily on Montano to argue that the "taint" of coercion upon the second confession in that case was equal to or less than that occurring in the present case, and that in neither Montano nor this case was the taint purged. We disagree.
Montano involved the stabbing murder of a young woman in Concord, California. The defendant was an 18-year-old Mexican national who had entered the United States illegally eight months earlier, had the equivalent of a junior high school education, and spoke little or no English. (226 Cal.App.3d at pp. 920-921, 936, 277 Cal.Rptr. 327.) The defendant was apprehended shortly after midnight while running away from the site where the victim's body was found. (Id. at pp. 920-921, 277 Cal.Rptr. 327.) Earlier that evening he had eaten nothing, but had consumed eight or nine beers and was drunk when apprehended. (Id. at pp. 921, 936, 277 Cal.Rptr. 327.) Approximately four hours after he was arrested, he was subjected to lengthy interrogation by two Concord police officers, Officers Breuker and Kincannon, the latter of whom acted as interpreter. Although the defendant was given Miranda warnings at the outset, the officers admitted they had decided "going into" the interview that they would not respect any attempt he might make to invoke his right to remain silent. (Montano, supra, at pp. 920, 935 fn. 6, 277 Cal.Rptr. 327.) The first interview was conducted from 4:03 a.m. to 5:30 a.m. (Id. at pp. 921, 929, 277 Cal.Rptr. 327.) During the course of that interview, Officer Breuker invoked his and defendant's shared Catholic faith, and the church's teachings about "repentance" and "hell," as a means of trying to extract a confession from the defendant. (Id. at pp. 924-925, 935, 277 Cal.Rptr. 327.) After numerous futile efforts at terminating the interrogation, defendant made an admission so damaging as to be tantamount to a confession. That is, when asked by the police if they had the right person in custody or if they needed to continue looking for the killer, he shook his head "no." (Id. at pp. 928-929, 277 Cal.Rptr. 327.) At a second interrogation session conducted several hours later, the defendant made a full confession to the murder of the young woman. The trial court granted the defendant's motion to suppress statements made in the first interview, on the grounds that they were involuntary and obtained in violation of the due process clause. (Id. at p. 929, 277 Cal.Rptr. 327.) However, the trial court concluded that the confession obtained in the second interview was "`admissible because it's not a product of the first.'" (Ibid.)
The Montano court summarized the evidence regarding the coerciveness of the first interview as follows: "It soon became apparent to [defendant] that his attempts to halt the questioning, using the right he was told was his, were a waste of time because the officers were not going to respect his invocation of that right. Again and again defendant told the officers that he did not wish to speak to them, to no avail. Each time defendant stated he did not wish to speak further, the officers ostensibly agreed to talk about other matters, but they soon resumed questioning him about aspects of the incident. The officers' conduct conveyed the unmistakable message that defendant's rights were meaningless. Faced with this `callous attitude of the police towards his rights' [citation], defendant could not help but believe that `the police wanted answers and were determined to get them.' [Citation.] Hung over, his pleas of fatigue and lack of sleep ignored, held in a police station in the dead of night [citation], defendant confronted inquisitors bent on denying him any respite and exploiting his obvious emotional turmoil. (`I can see the tears in your eyes. I know what happened tonight made you very, very bad feeling. Okay, *471 feel bad about that. I know it's in your mouth. What you want to tell me is right in your mouth. It just needs a little pushing to get it out.') Near the end of the session Officer Kincannon made it clear that defendant would undergo further interrogation. (`The other officers want to talk. What are we going to do when they come? ... Bruce [Officer Breuker] wants to talk to you a little bit more.') The recurring themes of the interrogation were the officers pressing defendant to (1) overcome his refusal to talk about aspects of the crime, and (2) agree to talk at a later time. As the relentless questioning continued, defendant would have `had every reason to expect that his ... interrogators intended to keep the pace up till he broke.' [Citation.] In these circumstances it would be the rare suspect whose `capacity for self-determination' would not be `critically impaired.' [Citation.] [¶] Defendant was not that rare suspect. Before he invoked his right to remain silent, defendant had admitted only that he had been carrying a knife; that he had been running when he was stopped by police; and that he had a `serious problem.' He would not admit that he had met any woman, much less the victim. By the time the interrogation ended, defendant had admitted that he was alone when `this bad thing happened'; that he thought he would be `in jail for a long time' because of the `problem' he had; that he had committed an `error' that night; that he knew what had happened; and that he had met the victim. And by shaking his head just after being told of the victim's death and being asked whether there was another person the police should be looking for, defendant tacitly admitted that he alone was responsible for the victim's murder. Viewed in their totality, defendant's admissions amounted to an inculpatory statement tantamount to a confession. [Citations.] The means by which the statement was obtained'inherently coercive police tactics[,] methods offensive to due process,' and direct `police infringement of the Fifth Amendment itself [citation]taint it as constitutionally involuntary. [Citation.]" (Montano, supra, 226 Cal.App.3d at pp. 936-937, 277 Cal.Rptr. 327.)
Based on this showing of coercion as to the first interview, the Montano court overturned the trial court's ruling on the second confession and, accordingly, reversed the defendant's murder conviction. (226 Cal.App.3d at pp. 938-941, 277 Cal. Rptr. 327.) The Montano court explained why it believed that the confession was obtained by exploitation of the primary illegality of the initial interrogation, and that the prosecution had failed to show the taint of involuntariness had been purged or otherwise dissipated: "The importance of Miranda warnings appears to depend on the nature of the underlying violation. If what [Oregon v. Elstad (1985) 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222] termed a `technical' or `procedural' Miranda violation is all that is involved, the curative powers of the warnings are potent. [Citation.] But the same `coercive police tactics ... that render the initial admission involuntary [also] undermine the suspect's will to invoke his rights once they are read to him' [citation] at a subsequent interrogation. The second set of Miranda warnings administered to defendant would thus have minimal effect. Having already seen that his earlier attempts to invoke one of the rights that the warnings told him he had were repeatedly ignored, there would be no basis for defendant to believe the same interrogators would act any differently the second time around. [¶] The factor of temporal proximity between the coercion and the confession is only slightly less favorable to defendant. When the first interrogation terminated at approximately 5:30 a.m., his prospects were bleak. The first interrogation had concluded with defendant in effect admitting that he was the murderer. Reflecting on this, defendant could not but conclude that he had thereby `let the cat [of his guilt] out of the bag.' [Citation.] The existence of defendant's first statement `is *472 of course vitally relevant to the voluntariness of [his] later statements.' [Citation.] Among `the psychological and practical disadvantages' [citation] under which defendant labored was the awareness that the process of his interrogation was not at an end, but had only reached a pause. Defendant could have no doubt that further questioning was in store for him, with the officers certain to press for a complete confession that filled in the gaps left by the damaging admissions he had already made. Defendant's summons to Officer Breuker, less than five hours after they parted, was nothing more than a surrender to the inevitable. [¶] It is only `the presence of intervening circumstances' [citation] that appears to work against defendant. Not surprisingly, it is here that the Attorney General makes his last stand. The fact that it was defendant who summoned Officer Breuker for the confession is undeniable. On the other hand, defendant remained in the inherently coercive atmosphere of the police station. If anything, the fact that after the first interrogation session defendant had been booked and put in a jail cell could only have increased his feelings of helplessness in that `strictest of custodial conditions.' [Citation.] There is no evidence that he consulted friends, relatives, or an attorney. He was in effect left to stew in his own juices and ponder the hopelessness of his situation in light of what he had already admitted. It is clear that during that period Officer Kincannon's manipulation of defendant's religious feelings bore the desired fruit. Officer Kincannon had told defendant to `talk to us about this problem' as `one of the basic steps of repentance,' without which defendant would `fall.' Defendant began his confession by announcing to Officer Kincannon that `at no time have I stopped repenting what I did.' This demonstrates that the ensuing confession was `a direct and obvious response to the interrogative techniques used ... during the earlier illegal interview.' [Citation.] [¶] Based on the circumstances detailed above, the psychologically coercive illegalities of the first interrogation were the motivating causes of the damaging admissions, and of the subsequent confession. [Citations.] [¶] Finally, the purpose and flagrancy of the official misconduct [citation] are totally in defendant's favor. That `[t]he illegality here ... had a quality of purposefulness' [citation] cannot be denied. That its purpose was intended to reduce defendant's resistance to the interrogating officers' desire for a confession is likewise beyond dispute. That purpose was effected by a persistent disregard of defendant's constitutional right to remain silent and not incriminate himself. With respect to flagrancy, this is a glaring example of police misconduct." (Montano, supra, 226 Cal.App.3d at pp. 938-939, 277 Cal.Rptr. 327.)
Appellant correctly notes that two of the factors cited by the Montano court favor his position: the interrogators and the location were the same for the first and second interviews in the present case. In every other material respect, however, Montano is distinguishable. At the time of the interviews, appellant was 30 years old, and a long-time resident of Northern California who was fully capable of speaking and understanding English. In light of his prior felony convictions, it is reasonable to infer that interrogation by the police was not a "novel experience for him." (Cf. Montano, supra, 226 Cal.App.3d at p. 936, 277 Cal.Rptr. 327.) Before both the first and second interviews, he had had a full night's sleep and, as far as the record discloses, he was not intoxicated or distraught during either interrogation.
There are numerous other, more significant, differences between Montano and this case. For example, on this record, we have grave doubts about the trial court's ruling that the first interview was rendered involuntary by the conduct of Detectives Tripp and Forrester. The only colorable claim of coercion in this case arises from Tripp's suggestion that appellant's sisters would be prosecuted if appellant *473 did not confess and that, by implication, they would be relieved of a threat of prosecution if he did confess. (Cf. People v. Boyde (1988) 46 Cal.3d 212, 238, 250 Cal. Rptr. 83, 758 P.2d 25 [express or implied promise of leniency may render a confession involuntary if the promise is a motivating cause of the decision to confess].) Even this claim is extremely thin, insofar as at least one of appellant's sisters, Karen Casillas, was involved to some extent in the assault on and robbery of Colchado, and Charlene admitted helping appellant wash his wounds in between the two altercationsthe fight with Garcia and Gutierrez, and the assault on Colchadoin which he was a participant. Any suggestion that the sisters might be prosecuted was, thus, not surprising and not entirely unjustified.
Even if Tripp's conduct was coercive in this respect, however, it was not nearly as "purposeful" or "flagrant" as that of the officers in Montano, who agreed to and did ignore the defendant's repeated attempts to halt the interrogation, and made it clear they would continue pressing him, and come back for further interrogation, until he confessed. (See 226 Cal.App.3d at p. 939, 277 Cal.Rptr. 327.) By contrast, in this case, appellant never invoked any of his Miranda rights, and the detectives never suggested they would return for further interrogation. There is, moreover, no indication that the low-level, arguably legitimate pressure Tripp applied during the first interview actually produced any inculpatory information. Whereas the defendant in Montano virtually confessed at the end of the first interview, appellant did not make any serious incriminating statement during the first session and, indeed, did not really change his story in any significant way after the supposed coercion was applied. He said that he had, at Veronica's urging, tried to get one of the Mexican men to leave, that he had gotten into a fight with and kicked the man, and that he had suffered a cut on his face when one of the other Mexican men swung a grape knife at him. Appellant never admitted being alone with Garcia, doing anything bad, or having a knife. He did not even admit knowing anyone was killed until the police told him about it, and certainly did not tell the police they did not need to look any further for the killer. Thus, unlike the defendant in Montano, who may have felt he had nothing further to lose and simply "surrenderfed] to the inevitable" in the second interview, appellant had no reason to believe he had "let the cat out of the bag" the first time around. (Cf. id. at p. 938, 277 Cal.Rptr. 327.)
Nor is there any suggestion that appellant was left to "stew in his own juices," as was the defendant in Montano, who knew the officers would be coming back to question him, and would continue to apply pressure him and play on his religious sensibilities until he broke down and told them what they wanted to hear. (226 Cal.App.3d at p. 939, 277 Cal.Rptr. 327.) Indeed, the defendant in Montano was the one who initiated the second interview a few hours after the first, immediately proclaiming that "`at no time did I stop repenting what I did.'" (Ibid.) This telling comment strongly suggests the police tactics used in the first interview had a deep impact on the defendant, continued to affect him as he languished in jail, and motivated him to ask for a second interview in which he more fully confessed to the murder. In the instant case, by contrast, the second interview was initiated by the police and neither they nor appellant mentioned anything about the first interview as they undertook the second.
Furthermore, as the trial court found, the passage of time between the first and second interviews in this case militates against a finding that the statements made on the second date were rendered involuntary as a result of some threat, coercion, or implied threats against appellant's family. This appears to be a ruling that coercion from the first interview either did not "taint" the second interview two days later, or that any "taint" had dissipated by the time appellant gave his second statemerit. *474 In addition, appellant was given Miranda warnings at the beginning of the second interview. Given the weak showing of coercion with respect to the first interrogation, and the fact that nothing untoward happened in the two-day interval between the end of the first interview and the beginning of the second, it is entirely reasonable to conclude that the "curative powers" of the warnings were considerable in this case.
In sum, on this record, we conclude there was no meaningful connection between any coercion applied by Tripp during the first interview and the confession obtained in the second interview and that, at a minimum, any such connection had become so attenuated by the time of the second interview as to dissipate the taint. (Beardslee, supra, 53 Cal.3d at p. 108, 279 Cal.Rptr. 276, 806 P.2d 1311.) Accordingly, the trial court did not err in allowing the prosecution to introduce appellant's second statement into evidence.

B. The Record is Inadequate For Decision of Appellant's Claims About an Improperly Delayed Arraignment.

For the first time on appeal, and in his petition for habeas corpus, appellant cites People v. Turner (1994) 8 Cal.4th 137, 175, 32 Cal.Rptr.2d 762, 878 P.2d 521, People v. Thompson (1980) 27 Cal.3d 303, 327, 165 Cal.Rptr. 289, 611 P.2d 883, and People v. Pettingill (1978) 21 Cal.3d 231, 242, 145 Cal.Rptr. 861, 578 P.2d 108, in support of a claim that the second confession should have been suppressed because his arraignment was purposely delayed beyond the 48-hour time limit for such proceedings (see County of Riverside v. McLaughlin (1991) 500 U.S. 44, 56-57, 111 S.Ct. 1661, 114 L.Ed.2d 49 (McLaughlin)), in order to extract a second confession under proper Miranda warnings. It is not clear from this record precisely when appellant was arraigned, but respondent does not dispute that appellant's first court appearance and arraignment occurred more than 48 hours after his "arrest" during the first interview on September 22, 1996. However, respondent contendsand appellant acknowledgesthat this issue was not raised below, and that such an omission ordinarily constitutes a waiver of the claim on appeal. (See People v. Mayfield (1993) 5 Cal.4th 142, 170, 19 Cal.Rptr.2d 836, 852 P.2d 331; People v. Kelly (1992) 1 Cal.4th 495, 519, 3 Cal.Rptr.2d 677, 822 P.2d 385.)
Appellant attempts to revive his claim on the theory that defense counsel was ineffective for failing to raise this additional ground for suppression in the trial court. In the alternative, appellant contends that defense counsel's omission should be excused, and no waiver found, on the ground that counsel was prevented from discovering this claim because Detective Tripp misrepresented the date on which the second interrogation was held so as to conceal any connection between the second confession and the delay in the arraignment. We conclude that the record before this court is not sufficiently well developed for us to assess the merits of these arguments and that, in any event, they would be far better addressed by the trial court in the first instance should they arise again on remand.
"To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. [Citations.] [¶] Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight. [Citation.] `When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" [citation], the contention must be rejected.' [Citation.] A reviewing court will not second-guess trial counsel's reasonable tactical decisions. [Citation.]" *475 (People v. Kelly, supra, 1 Cal.4th at pp. 519-520, 3 Cal.Rptr.2d 677, 822 P.2d 385.)
This is not a case in which "there simply could be no satisfactory explanation" for defense counsel's failure to challenge the second confession based on the slightly delayed arraignment. There is, for example, a strong suggestion that appellant was on parole at the time of his arrest and, thus, was not entitled to the benefit of the McLaughlin rule. As the United States Supreme Court held in Morrissey v. Brewer (1972) 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, a parolee is only entitled to a probable cause determination "as promptly as convenient after arrest." (Id. at p. 485, 92 S.Ct. 2593; see also Vargas v. U.S. Parole Comm'n (9th Cir.1988) 865 F.2d 191, 194 [40-day delay in arraignment of parolee did not violate due process absent some showing of prejudice].) While we recognize there is nothing dispositive in the record on appeal regarding appellant's parole status, the record at least suggests a legitimate tactical reason for trial counsel's failure to make the "delayed arraignment" arguments appellant raises on appeal. In these circumstances, appellant's claim of ineffective assistance of counsel must be rejected. (People v. Kelly, supra, 1 Cal.4th at pp. 519-520, 3 Cal.Rptr.2d 677, 822 P.2d 385.) However, we reject this claim without prejudice to his raising it again on remand if he chooses to do so.
We further note, however, that the present showing of police and/or prosecutorial misconduct is weak at best. While it appears Tripp misstated the date of the second interview as September 23 on page 65 of his report, he correctly stated the day (Tuesday) on that same page. Tripp stated other correct day/date combinations (e.g., "Sunday 9/22/96," and "Monday 9/23/96") on other pages of the same report. These facts seem likely to dispel any inference of misconduct or improper motive in connection with the delayed arraignment. Moreover, while the information in Tripp's report may have been a bit confusing, reasonably astute defense counsel would have been able to consult a calendar to sort out the true chronology. Reasonably competent defense counsel could also conclude the errors in this report were just that, and decline to raise such a weak basis for challenging the confession.[9]

C. The People Have Not Overcome the Presumption of Prejudice Arising From the Undisputed Jury Misconduct That Occurred in This Case.

Appellant's principal contention on appeal is that the trial court erred when it found he was not prejudiced by jury misconduct which undisputedly occurred in this case. We agree with appellant on this point, but only insofar as the jury misconduct affected the verdict on count one, for the murder of Garcia.
The prosecution's theory was that appellant and his companions planned to rob Garcia and his friends and that, during a fight that subsequently broke out, appellant pursued Garcia to the area of the fence and, aided by Kenny, stabbed Garcia to death. As to count one, the prosecution argued that the evidence was sufficient to support a conviction of first degree murder but, if not, it would at a minimum support a conviction of second degree "implied malice" murder. It is quite clear from the juror depositions, and from the verdicts themselves, that the jury unanimously found the evidence of premeditation and deliberation insufficient for a conviction of first degree murder. Thus, the jury's decision on count one boiled down to a choice between second degree murder, voluntary manslaughter, and acquittal. In choosing between second degree murder and voluntary manslaughter, the jury's assessment of the evidence of "malice" was critical to their decision.
*476 Appellant contends, and respondent does not dispute, that the jury engaged in misconduct when it consulted a legal dictionary to clarify for itself the meaning of the term "malice" as that term is used in CALJIC No. 8.11. As our Supreme Court explained in People v. Karis (1988) 46 Cal.3d 612, 250 Cal.Rptr. 659, 758 P.2d 1189: "Resort to outside sources for amplification of instructions is not permitted. Jurors are not allowed to obtain information from outside sources either as to factual matters or for guidance on the law. [Citations.] Use of a dictionary to obtain further understanding of the court's instructions poses a risk that the jury will misunderstand the meaning of terms which have a technical or unique usage in the law." (Id. at p. 642, 250 Cal.Rptr. 659, 758 P.2d 1189, footnote omitted; People v. Honeycutt (1977) 20 Cal.3d 150, 157, 141 Cal.Rptr. 698, 570 P.2d 1050 [improper for juror to consult his company's business lawyer for definition of "diminished capacity"]; Glage v. Hawes Firearms Co. (1990) 226 Cal.App.3d 314, 325, 276 Cal.Rptr. 430 [improper use of dictionary definition of "preponderance"]; People v. Harper (1986) 186 Cal.App.3d 1420, 1426, 231 Cal.Rptr. 414 [improper use of dictionary definition of "murder"]).
The parties disagree, however, about the prejudicial effect of the jury misconduct in this case. Again, the Karis court summarized well the analysis we must apply to resolve this issue: "The rules governing jury misconduct are clear. `Jury misconduct raises a presumption of prejudice, and "unless the prosecution rebuts that presumption ..., the defendant is entitled to a new trial." [Citations.] The presumption of prejudice "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party...." [Citation.] Whether a defendant has been prejudiced by a juror's outside communications depends upon "whether the jury's impartiality has been adversely affected, and whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted." [Citations.]' [Citation.]" (46 Cal.3d at p. 642, 250 Cal.Rptr. 659, 758 P.2d 1189.)
Plainly, a presumption of prejudice arose from the misconduct in this case. As we have noted, however, the trial court apparently found the prosecution overcame the presumption by demonstrating that the dictionary definition of "malice" did not differ significantly from the definition provided in CALJIC No. 8.11. Presumably, the trial court believed nothing in the dictionary definition lightened the prosecution's burden of proof, or contradicted any defense, or caused the jury to "misunderstand the meaning of terms which have a technical or unique usage in the law." (Karis, supra, 46 Cal.3d at p. 642, 250 Cal.Rptr. 659, 758 P.2d 1189.) After a careful examination of the dictionary definition the bailiff provided to the jury, we cannot agree.
"Second degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elementsi.e., willfulness, premeditation, and deliberation that would support a conviction of first degree murder. [Citations.] In contrast, manslaughter is the unlawful killing of a human being without malice. [Citations.] [¶] Malice, for the purpose of defining murder, may be express or implied. [Citation.]" (People v. Nieto Benitez (1992) 4 Cal.4th 91, 102, 13 Cal.Rptr.2d 864, 840 P.2d 969 (italics omitted) (Nieto Benitez ).) As defined by Penal Code section 188, malice is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature," and implied malice is present "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Ibid.; and see People v. Mattison (1971) 4 Cal.3d 177, 182, 93 Cal.Rptr. 185, 481 P.2d 193.) However, "Translation of the statutory elements of implied malice into plain, understandable jury instructions has undergone an evolutionary process." (People v. Nieto Benitez, supra, at p. 103, 13 Cal. *477 Rptr.2d 864, 840 P.2d 969, citing People v. Bellinger (1989) 49 Cal.3d 1212, 1217-1222, 264 Cal.Rptr. 841, 783 P.2d 200.)
The Nieto Benitez court described the long tortuous path of that evolution as follows: "Initially, the controlling decisions upheld a jury instruction that relied on the statutory definition of implied malice, permitting the jury to find malice if the killing were done with `an abandoned and malignant heart.' [Citation.] Subsequent decisions determined, however, that such an instruction was too cryptic. [Citations.] In People v. Phillips [ (1966) 64 Cal.2d 574, 587, 51 Cal.Rptr. 225, 414 P.2d 353], we observed that an instruction which relies on the term `abandoned and malignant heart' invites confusion and unguided speculation, for it `could lead the jury to equate the malignant heart with an evil disposition or a despicable character; the jury, then, in a close case, may convict because it believes the defendant a "bad man."' [¶] Two lines of decisions developed, reflecting judicial attempts to `translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply.' [Citations.] One strand held that malice could be implied where `the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' [Citations.] The alternate strand held that malice could be implied where the killing was proximately caused by `"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."' [Citations.] [¶] In People v. Watson (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279], we observed that the language employed in defining implied malice in the two strands of cases was substantively similar. (Id. at p. 300 [179 Cal.Rptr. 43, 637 P.2d 279].) We therefore concluded that second degree murder with implied malice has been committed `when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.... [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]' [Citation.] [¶] Thus, we held in Watson that the two definitions of implied malice which had evolved from the foregoing cases actually articulated one and the same standard. [Citations.] As we observed in Dellinger, however, the drafters of the fourth edition of CALJIC, in formulating CALJIC No. 8.11 ..., substituted the disjunctive `or' for Watson's transitional words, `[p]hrased in a different way.' [Citation.] This wording in the instruction caused confusion in the decisions of the Courts of Appeal as to whether the term `wanton disregard for human life' adequately conveyed the subjective-awareness component of implied malice. [Citations.] We concluded in Dellinger that instructing the jury with this term was adequate, but that due to the obscure phraseology of the term, the better practice in the future would be to charge juries `solely in the straightforward language of the "conscious disregard for human life" definition of implied malice.' [Citation.] This preferred definitionwithout its counterpart of `wanton disregard for human life'[was] set forth in the fifth edition (1988) versions of CALJIC Nos. 8.11 and 8.31, which we approved in Dellinger. [Citation.]" (People v. Nieto Benitez, supra, 4 Cal.4th at pp. 103-104, 13 Cal. Rptr.2d 864, 840 P.2d 969.)
As appellant asserts, the dictionary definitions of "malice" reviewed by the jury differ from CALJIC No. 8.11, in at least three ways. Even more significantly, however, appellant points out that the dictionary definitions were in certain respects inconsistent with California law, and are phrased such that a juror couldand, in this case, apparently didfind appellant acted with "implied malice" in connection with the killing of Garcia, even though the juror believed the evidence was insufficient to satisfy the correct legal standard provided by CALJIC No. 8.11.
*478 Specifically, appellant claims subsection [1]which provides that malice is "[t]he state of mind that accompanies the intentional doing of a wrong act without justification or excuse"allowed the jury to convict appellant of murder, based on a showing that amounts to nothing more than general criminal intent. This dictionary definition in no way states or even suggests the subjective components of knowledge of the risk of death, and conscious disregard for human life that are essential to a conviction for second degree murder. (People v. Nieto Benitez, supra, 4 Cal.4th at p. 105, 13 Cal.Rptr.2d 864, 840 P.2d 969; People v. Dellinger (1989) 49 Cal.3d 1212, 1219-1222, 264 Cal.Rptr. 841, 783 P.2d 200.) As our colleagues in the Third Appellate District recently observed: "Implied malice requires a subjective awareness of a high probability of death with a wanton disregard thereof. [Citations.] Implied malice may be distinguished from gross negligence by both the higher degree of the risk involved and by the requirement that the risk be subjectively appreciated rather than merely objectively apparent." (People v. Schmies (1996) 44 Cal.App.4th 38, 46, fn. 4, 51 Cal.Rptr.2d 185; see also People v. Watson (1981) 30 Cal.3d 290, 300, 179 Cal. Rptr. 43, 637 P.2d 279.)
In addition, appellant claims subsection [6]which provides that malice "[d]enotes a reckless disregard of human life which proceeds from a heart and mind devoid of a just sense of social duty and fatally bent on mischiefallowed the jury to find appellant guilty of murder based on a showing he acted only with a "reckless disregard of human life." While the term "reckless" is not further defined, it is capable of an interpretation that does not require subjective awareness of the danger the conduct poses to human life and, in that respect, is a less culpable mental state than "conscious disregard" of a known danger to human life. (See CALJIC No. 8.11; cf. CALJIC No. 3.36 [reckless acts form basis of one specie of "gross" or "criminal negligence"].)
A further defect in subsection [6] is that the phrase "a heart and mind devoid of a just sense of social duty and fatally bent on mischief is reminiscent of the term "abandoned and malignant heart," which was formerly used in second degree murder instructions, but disapproved over 30 years ago in People v. Phillips (1966) 64 Cal.2d 574, 51 Cal.Rptr. 225, 414 P.2d 353. (See People v. Nieto Benitez, supra, 4 Cal.4th at p. 103, 13 Cal.Rptr.2d 864, 840 P.2d 969.) The problem with such language is that it allows a jury to find a defendant guilty of murder based on a belief that he has "an evil disposition or a despicable character," or simply because they think he is a "`bad man.'" (Ibid.) As the Phillips court noted, "We should not turn the focus of the jury's task from close analysis of the facts to loose evaluation of defendant's character." (64 Cal.2d at pp. 587-588, 51 Cal.Rptr. 225, 414 P.2d 353.)
In this case, it is not just a theoretical possibility that jurors reading the foregoing dictionary definitions might have misunderstood or misapplied the definition of "malice" given to them by the trial court. As a result of the trial court's post-verdict inquiry, we know at least one hold-out juror was not convinceduntil after consulting the legal dictionarythat the prosecution had proven appellant had acted with "malice," within the meaning of CALJIC No. 8.11, in the killing of Garcia. Indeed, that juror was particularly uncomfortable about the meaning of the term "conscious disregard of human life," and the evidence relating to that element, before the dictionary was brought in by the bailiff. Although we do not know precisely which aspect of the dictionary definition finally convinced her of appellant's guilt of second degree murder, we do know that after reading it "three or four times," Juror No. 11 "was able ... to pick out a few other definitions that made malice comfortable for [her]."
Respondent contends, however, that reliance on the dictionary definitions of "malice" wasat mosta matter of jury misunderstanding of one element of the offense of second degree murder. In other words, respondent claims this issue should be treated as one of instructional error as *479 to one element of the offense, and urges us to find the error harmless if the evidence establishes beyond a reasonable doubt that the result would have been the same had the jury applied the correct definition. Again, given the clear showing in this case that at least one juror was not convinced by the prosecution's case under the instructions given by the court, we simply cannot agree. While we may infer the jury found beyond a reasonable doubt that appellant at least aided and abetted the killing of Garcia, we have no reliable way of divining which mens rea and which type of homicide the jury would have settled upon had it not resorted to outside sources of guidance.
We also reject respondent's claim that the jury considered and necessarily rejected a charge of manslaughter when it found appellant personally used a knife and inflicted great bodily injury upon Garcia. On the contrary, we assume the jury followed the trial court's instructions to come to unanimous agreement about the various forms of murder before it could finally decide whether to convict appellant of any type of manslaughter. (See CALJIC No. 8.75.)[10] Furthermore, neither of these enhancements require subjective knowledge and conscious disregard of danger to human life. Moreover, respondent's claim that appellant undisputedly did all the stabbing comes perilously close to being frivolous. The red-handled knife was found in Kenny Faber's room, under Kenny's bureau, and at least one witness testified that Kenny had admitted stabbing Garcia.
Finally, we cannot say beyond a reasonable doubt that no jury would have found appellant guilty of a lesser offense, such as voluntary manslaughter, had the jury applied the correct definition of "malice." (See Yates v. Evatt (1991) 500 U.S. 391, 402-05, 111 S.Ct. 1884, 114 L.Ed.2d 432.) There was ample testimony that, if considered and believed, would have supported a verdict of voluntary manslaughter and a finding of absence of malice. That is, several witnesses described how one of the Mexican men, probably Garcia, slashed appellant's face with a knife during a fight. In addition, the jury depositions revealed that at least one juror and possibly others were torn between murder and manslaughter until they reviewed the dictionary definition. On this record, it would not have been unreasonable for the trier of fact to conclude, upon rejecting the prosecution's evidence of "malice," that appellant killed Garcia upon sudden provocation and in the heat of passion, or in an honest but unreasonable belief that he needed to defend himself against the knife-wielding victim. In short, respondent has not demonstrated that the jury misconduct in this case was harmless beyond a reasonable doubt.[11]

D. The Jury Misconduct Had No Conceivable Impact on the Conviction for the Robbery of Colchado.

Appellant further contends that the jury misconduct in this case somehow *480 affected the jury verdict on his conviction for the robbery of Colchado. He relies on the testimony of four jurors to the effect that they had not yet reached a unanimous verdict on the robbery count when they asked for and reviewed the dictionary definition of "malice." Appellant reasons from this evidence as follows: "[H]aving agreed to convict on the murder charge, the jurors who earlier had been unsure on the robbery charge decided that they might as well become unanimous on the robbery, too, so they could go home and resume their normal lives." Appellant refers to this as the "bandwagon effect." This argument is based on pure speculation, and we reject it.
The conduct underlying the robbery conviction was plainly distinct from that on which the jury found appellant guilty of murdering Garcia, and none of the elements or instructions on the robbery offense contains the word "malice" or depends in any way on the jury's understanding of that term. There is no evidence whatsoever that the jury used the dictionary for any purpose other than to inquire into the mens rea required for the various homicide charges it was pondering. Thus, we do not see any way the jury's inquiry into the meaning of "malice" could have affected its assessment of the evidence relating the robbery of Colchado. We are, moreover, entirely unwilling to indulge an assumption that any juror violated his or her oath and voted to convict appellant of robbery without believing the prosecution had proven all the elements of that offense, as defined in the applicable instructions, beyond a reasonable doubt. Accordingly, we conclude the jury misconduct in this case resulted in no prejudice to appellant with respect to the robbery conviction.

E. Appellant Has Established No Other Basis for Reversing His Conviction for the Robbery of Colchado.

Appellant raises two additional claims of error which, he contends, provide a basis for reversing his robbery conviction. First, he contends the trial court erred by allowing the prosecutor to introduce, for the first time on rebuttal, a purported "confession" by appellant regarding the robbery. Second, he contends it was prejudicial error to give CALJIC No. 2.11.5[12] to the extent the jury could view it as applying to prosecution witness Veronica Faber, who may have been involved in the robbery. We reject these claims.
As to the purported "confession" presented through Karen Casillas on rebuttal, appellant's claim fails because he mischaracterizes her testimony. During the defense case, Charlene Somersall had testified that it was Kenny and Veronica Faber, and not Karen, who had gone through Colchado's pockets. As we have noted, Charlene gave further conflicting *481 testimony about appellant's role, saying he did not join the fight, that she was not sure what he did, and, ultimately, that he probably did hit Colchado a couple of times or perhaps just swung at him. The rebuttal testimony about which appellant complains was a statement with which Karen was impeached after she, too, testified (despite the fact she had pled guilty to the robbery) that it was Veronica Faber, and not she, who went through Colchado's pockets. That is, the prosecutor asked Karen about a statement she had previously made to the police, saying that appellant was the one who had gone through Colchado's pockets. Karen responded that this statement to the police was a lie she told because appellant had said "he would take the blame for whatever those kids did." The prosecutor then attempted to demonstrate Karen was lying in this explanation by asking her about a further statement she made to the police, claiming Kenny was involved in the assault on Colchado. This statement about the teenaged Kenny, the prosecutor claimed, showed Karen was not really interested in helping protect the "kids."
As is apparent from the foregoing, appellant distorts the record by claiming that Karen testified about a "confession" by which "appellant admitted to her that he went through Colchado's pockets." In her statement to the police, Karen merely said appellant went through Colchado's pockets. Not only was this not a confession, it was proper rebuttal with evidence "made necessary by the defendant's case in the sense that [the defendant] has introduced new evidence or made assertions that were not implicit in his denial of guilt." (People v. Carter (1957) 48 Cal.2d 737, 753-754, 312 P.2d 665.) Once Charlene asserted in the defense case that Karen did not go through Colchado's pockets, it was a perfectly proper form of rebuttal to elicit an admission from Karen (consistent with her guilty plea), that she was indeed the culprit who stole Colchado's money. Then, when Karen denied her role in the theft and, instead, corroborated Charlene's account by accusing Veronica, it was again entirely proper for the prosecutor to try to impeach Karen with her prior inconsistent statement accusing appellant, and to explore her explanation for supposedly lying to the police.
As to appellant's claim of error regarding the giving of CALJIC No. 2.11.5, respondent agrees that the trial court should not have given the pattern instruction in this case (see, e.g., People v. Williams (1997) 16 Cal.4th 153, 226-227, 66 Cal.Rptr.2d 123, 940 P.2d 710), but claims the error was harmless. More specifically, respondent contends there was no reasonable likelihood the jury misunderstood the law applicable to Veronica's testimony because the jury was also instructed with CALJIC Nos. 2.20, 3.10, 3.11, 3.12, 3.13, 3.18 and 3.19. Among other things, these instructions caution the jury to consider "the existence or nonexistence of a bias, interest, or other motive" of the witnesses appearing at trial (CALJIC No. 2.20), and to "view ... with distrust" the testimony of any accomplice (CALJIC No. 3.18). The jury was also given CALJIC No. 1.01, which directed it to "[c]onsider the instructions as a whole."
People v. Carrera (1989) 49 Cal.3d 291, 261 Cal.Rptr. 348, 777 P.2d 121, amply supports respondent's position in this respect. The Carrera court recognized it was error to give CALJIC No. 2.11.5 where a prosecution witness, who was a co-participant in one or more of the charged crimes, was testifying under a grant of immunity. The problem was that the jury might have understood the instruction to mean it should not consider whether the witnessas opposed to the defendantcommitted the offenses, or might have believed the instruction precluded it from considering whether the grant of immunity gave the accomplice a strong incentive to testify favorably to the prosecution. (Carrera, supra, at p. 313 & fn. 11, 261 Cal.Rptr. 348, 777 P.2d 121.) Nevertheless, the court held that "[t]he potential for such a misunderstanding of the instruction appears minimal" where the jury is also instructed with CALJIC Nos. 1.10, 2.20, and the other instructions about accomplice testimony. (People v. *482 Carrera, supra, at p. 313 & fn. 11, 261 Cal.Rptr. 348, 777 P.2d 121.) In addition, the prosecutor in this case never suggested the jury could not consider the co-participants' motives to lie. On the contrary, with respect to Veronica, the prosecutor readily acknowledged that she was lying when she said no one suggested robbing the four farm laborers and, when the prosecutor urged the jury to believe her about appellant's turning Colchado over so Karen could go through his pockets, it was with corroboration, i.e., the presence of appellant's blood on the back of Colchado's shirt. Thus, whether we apply a "harmless beyond a reasonable doubt" standard (Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705) or merely seek to determine if it is reasonably probable a result more favorable to defendant would have been reached had CALJIC No. 2.11.5 not been given (People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243), appellant cannot have been prejudiced.

F. The Conviction on Count Three, For the Aggravated Assault Upon Colchado, Must be Reversed.

The only substantial claim of error raised as grounds for reversing appellant's conviction of aggravated assault is based upon our Supreme Court's recent decision in People v. Mendoza, supra, 18 Cal.4th 1114, 77 Cal.Rptr.2d 428, 959 P.2d 735, which held that evidence of voluntary intoxication is admissible to negate the knowledge and intent required to establish aiding and abetting liability for assault, a crime which does not itself have a specific intent element. (Id at pp. 1131-1134, 77 Cal.Rptr.2d 428, 959 P.2d 735.) More precisely, the Mendoza majority held that the mental state required for imposition of aiding and abetting liability is a "required specific intent" within the meaning of Penal Code section 22, subdivision (b). (Mendoza, supra, at p. 1131, 77 Cal. Rptr.2d 428, 959 P.2d 735.)
Appellant did not suggest, much less rely on, a theory of aiding and abetting with respect to the aggravated assault charged in this case. Indeed, defense counsel acknowledged at trial that appellant was angry at having been cut by Garcia, and so he attacked Colchado. As such, defense counsel conceded that appellant was "guilty of assault and battery." In his brief on appeal, however, appellant claimed this concession was only made as to "guilt of simple misdemeanor assault." At oral argument, appellant's current counsel explained that this is and was merely a concession that appellant may have participated in the attack but, at most, inflicted a few of the blows to Colchado. It was not a concession that appellant had the knowledge and intent required for "aiding and abetting" an aggravated assault. Appellant notes that the most serious blows to Colchado were probably those that left the imprint of a shoe sole on the victim's shirt, evidence that was consistent with Kenny or Kimberly Faberbut not appellanthaving kicked Colchado. Had the jury had a chance to consider appellant's state of intoxication during the attack on Colchado, appellant claims it is possible the jury would have found he was not the principal assailant, that he did not land any serious blows, that Kenny and Kimberly Faber (and perhaps others) were the principals in the aggravated assault, and that he was too drunk to have the requisite knowledge and intent to assist the Fabers in that regard. Appellant thus contends the trial court committed reversible error by suggesting to the jury, through its instructions on aiding and abetting and the effect of voluntary intoxication, that it could not consider intoxication as a defense to aiding and abetting an aggravated assault on Colchado. We agree.
In this case, the prosecution did not focus on a theory of aiding and abetting with respect to the assault upon Colchado, and the prosecutor made no such argument to the jury. However, upon request by the prosecutor, the trial court did instruct the jury on an aiding and abetting theory of criminal responsibility as to count three using modified versions of CALJIC Nos. 3.00, 3.01, 3.02, as follows: "Persons who are involved in committing a *483 crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: [¶] Those who directly and actively commit the act constituting the crime, or [¶] Those who aid and abet the commission of the crime. [¶] A person aids and abets the commission of a crime when he or she, [¶] With knowledge of the unlawful purpose of the perpetrator and [¶] With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] By act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] Mere presence at the scene of the crime which does not in itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.... [¶] In order to find the defendant guilty of the crimes of robbery and assault with a deadly weapon in counts 2 and 3, you must be satisfied beyond a reasonable doubt that: [¶] The crime or crimes of robbery and assault with a deadly weapon were committed; [¶] The defendant aided and abetted those crimes; [¶] And that a co-principal in that crime committed the crimes of robbery assault, and assault with a deadly weapon."
The trial court also advised the jury that assault is a general intent crime, using a modified version of CALJIC No. 3.30, as follows: "In the crime charged in count[] 3, namely, assault with a deadly weapon, and the crimes of assault, a misdemeanor and battery, a misdemeanor, which are lesser crimes and ... special allegations 2, 3, and 4, ... inflicting great bodily injury, ... there must exist a union [or] joint operation of act or conduct and general criminal intent. General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful." The court then read modified versions of CALJIC Nos. 9.02 and 9.08, setting forth the elements of assault by means of force likely to produce great bodily injury, including the limitation that "[p]roof of such assault need not show that defendant actually injured the other person."
Using a modified version of CALJIC No. 4.21.1, the trial court further instructed the jury that it was not to consider appellant's voluntary intoxication as a defense to count three, as follows: "It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of this condition, [¶] Thus, in the crime of second degree murder, a killing resulting from an unlawful act dangerous to human life ... [or] the crime of assault with a deadly weapon charged in count 3, or the crime[s] of assault and battery which are lesser thereto, the fact that the defendant was voluntarily intoxicated is not a defense and does not relieve defendant of responsibility for those crimes. This rule applies in this case only to the crimes of second degree murder [insofar as] a killing results from an unlawful act dangerous to life ... and the crime of assault with a deadly weapon charged in count 3 and the lesser crimes of assault and battery. [¶] However, there is an exception to this general rule, namely where a specific intent or mental state is an essential element of a crime. In [that] event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required specific intent or mental state at the time of the commission of the alleged crime, [¶] Thus in the crimes of robbery, murder in the first degree, and murder in the second degree, unpremeditated ..., and voluntary manslaughter, a necessary element is the existence in the mind of the defendant of a certain specific intent or mental state which is included in the definition of the crime set forth elsewhere in these instructions, [¶] If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not the defendant had the required specific intent or mental state. [¶] If from all the evidence *484 you have a reasonable doubt whether the defendant had that specific intent or mental state, you must find that defendant did not have that specific intent or mental state."
The prosecutor drove home the point that evidence of voluntary intoxication could not be considered with respect to the assault charge when he argued as follows: "In your instructions that the judge read to you, one of them specifically deals with voluntary intoxication. And it tells you that things like implied malice, second degree murder, assault with a deadly weapon, and the lessers to assaultwell, in our case it's not assault with a weapon. It's actually assault with the likelihood of committing great bodily injury is essentially what we have. And the lessers to that, which would be, one, assault or, two, battery. Those kinds of crimes do not have to have a specific intent to do some specific thing which is against the law such as intent to kill or, in robbery, the intent to steal. So, therefore, in those crimes, second degree and what is the shorthand term legally, ADW, or assault with force likely, as we have in this case, it doesn't matter if you are blitzed. If you made your hand move and your brain was able to function enough to make your hand move, you don't have a defense because of being intoxicated." (Italics added.)
Under the rule of Mendoza, supra, 18 Cal.4th 1114, 77 Cal.Rptr.2d 428, 959 P.2d 735, an instruction regarding the effect of voluntary intoxication upon the defendant's ability to form the intent for imposition of aiding and abetting liability would have been required, upon request, at least as to the assault charge in this case.[13] No such request was made by defense counsel, who did not have the benefit of our Supreme Court's opinion in Mendoza. Respondent has not contended that appellant's claim of error under Mendoza has been waived by his failure to request a special instruction of this type, or by his failure to object to the instructions on this basis. We, therefore, proceed to the merits of appellant's claim and conclude that the trial court's decision to instruct the jury on aiding and abetting liability for the assault upon Colchado, and simultaneously to admonish the jury that it could not consider appellant's state of intoxication in resolving that issue, rendered the instructions erroneous. As the Mendoza court held, "[A] trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does instruct, as the court did here, it has to do so correctly." (Id. at p. 1134, 77 Cal.Rptr.2d 428, 959 P.2d 735.) In that regard, the issue becomes whether "it is `reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence in deciding aiding and abetting liability" (ibid.; quoting People v. Castillo (1997) 16 Cal.4th 1009, 1017, 68 Cal.Rptr.2d 648, 945 P.2d 1197) and, if so, whether there is a reasonable probability that the error affected the verdict adversely to defendant. (Mendoza, supra, at pp. 1134-1135, 77 Cal.Rptr.2d 428, 959 P.2d 735.)
In this case, it is quite likely that the jury believed it was not permitted to consider the appellant's state of intoxication in deciding count three under any theory. Respondent contends, however, that any error in the trial court's instructions was harmless. Respondent reasons that the jury, under a proper instruction modeled after CALJIC No. 17.20, found beyond a reasonable doubt that appellant "personally inflicted great bodily injury" in committing the assault upon Colchado, for purposes of the enhancement allegation under Penal Code section 12022.7. This finding, respondent contends, means the jury necessarily resolved the aiding and abetting issue adversely to appellant. Not so. On this record, the most that can be said about the jury's finding under Penal Code section 12022.7 is that appellant "could *485 have caused the great bodily injury suffered." (See People v. Corona (1989) 213 Cal.App.3d 589, 594, 261 Cal.Rptr. 765; see also People v. Magana (1993) 17 Cal. App.4th 1371, 1380, 22 Cal.Rptr.2d 59.) Under proper instructions, and with a full and fair opportunity for argument on an aiding and abetting theory and the effect of voluntary intoxication as to count three, it is reasonably probable a jury could find that appellant was not the principal assailant, that he did not personally inflict the blows that caused great bodily injury, and that he was too drunk to knowingly and intentionally aid the Fabers in committing an aggravated assault upon the victim. In these circumstances, we cannot find the error in the jury instructions to be harmless and, accordingly, appellant's conviction on count three must be reversed.

III. CONCLUSION
For all the foregoing reasons, the judgment of conviction in No. A081134 is affirmed as to count two (for the robbery of Colchado) and reversed as to counts one (for the murder of Garcia) and three (for the aggravated assault upon Colchado). Because the sentence imposed by the trial court was structured around the murder conviction, the sentence is vacated and the matter is remanded for further proceedings consistent with this opinion. Appellant's petition for habeas corpus, No. A086816, is denied as moot.[14]
HANLON, P.J., and POCHÉ, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] On December 17, 1997, appellant was sentenced to a total term of 82 years in prison, as follows: a base term of 45 years to life for the murder, plus consecutive terms of 1 year for personal knife use, 10 years for two prior "serious felony" convictions under section 667, subdivision (a), 1 year for the prior conviction under section 667.5, subdivision (b), and 25 years to life for the robbery. On April 27, 1998, the trial court stayed one of the 5year enhancements for one of the prior serious felony convictions, thus reducing the total prison term to 77 years to life. Appellant also received a concurrent term of 25 years to life for the assault, and was ordered to pay a restitution fine of $10,000. He received custody credits of 519 days.
[2] All further dates are in 1996 unless otherwise indicated.
[3] To avoid confusion between and among people with the same last names, we will refer to the members of appellant's family and to his friends by their first names. Of course, we do not intend any disrespect by this designation.
[4] According to the probation report, appellant is 5 feet, 7 inches tall and weighs about 200 pounds. Kenny is 5 feet, 11 inches tall and weighs between 180 and 185 pounds.
[5] In rebuttal, the prosecutor called Karen to testify. She said she pled guilty to robbery against the advice of her lawyer. She denied going through Colchado's pockets, and said she lied when she told the detectives appellant said he went through them. She claimed appellant never got near Colchado's pockets.
[6] This proceeding was conducted, over defense counsel's objection, in appellant's absence and before appellant had an opportunity to file a motion for new trial. Defense counsel also repeatedly invoked Evidence Code section 1150 and People v. Turner (1971) 22 Cal.App.3d 174, 183, 99 Cal.Rptr. 186, to contend that the court was improperly inquiring into the mental processes by which the jurors reached their verdicts. For reasons that will become apparent, appellant does not renew his objections to the questioning conducted by the trial court in this case. However, citing Rushen v. Spain (1983) 464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267, and People v. Robertson (1989) 48 Cal.3d 18, 60, 255 Cal.Rptr. 631, 767 P.2d 1109, appellant does here contend that the trial court's decision deprived him of his constitutional right to be personally present at all critical stages of trial. (See also Pen.Code, § 977.) In light of our ruling on the prejudicial jury misconduct in this case, we don't need to reach the issue of the propriety of the trial court's decision to proceed in this fashion. Plainly, the trial judge's intentions were laudablei.e., to not inconvenience the jurors by potentially bringing them back in the future, to avoid potential difficulties in locating them, and to preserve the record while it was fresh in everyone's mind. If anything, the record thus established by the trial judge actually worked in defendant's favor by clearly setting forth the prejudice that resulted from the misconduct.
[7] The bracketed numbers have been used uniformly by the parties to delineate the various definitions of malice that might have been considered by the jurors. The brackets around the terms "ACTUAL" and "CONSTRUCTIVE, PRESUMED" were in the dictionary as provided to the jury.
[8] The foreperson's recollection of the incident was in all material respects consistent with that of Juror No. 11.
[9] To the extent appellant has developed his "delayed arraignment" claims any further in his petition for habeas corpus, we reject those claims and will exercise our discretion to deny the petition on the ground that he has another plain, speedy, and adequate remedy for any colorable prosecutorial misconduct or ineffective assistance of counsel, i.e., a renewed motion to suppress his second statement on remand. (See, e.g., In re Brandon C. (1993) 19 Cal.App.4th 1168, 1171, 23 Cal. Rptr.2d 571.)
[10] Pursuant to CALJIC No. 8.75, the jury was free toand apparently didconsider the voluntary manslaughter theory before it unanimously agreed to convict appellant of second degree murder. However, there is nothing in the juror depositions indicating that they ever reached unanimous agreement on the charge of voluntary manslaughter. And we have no way of knowing whether the jury would have finally reached a unanimous verdict on that charge if it had continued deliberating without consulting a legal dictionary. Under CALJIC No. 8.75, the jury could not convict appellant of voluntary manslaughter until it had unanimously agreed to acquit him of both first and second degree murder. Obviously, the jury did not get that far.
[11] In a petition for rehearing, respondent contends that the proper remedy, upon reversing the judgment of conviction as to count one, is to modify the judgment to a conviction for voluntary manslaughter should the state choose not to retry the matter. (See e.g., People v. Benway (1985) 164 Cal.App.3d 505, 513, 210 Cal.Rptr. 530.) We reject this argument. Ignoring for the moment the dissonance between this claim and respondent's previous argument that the jury necessarily rejected the charge of voluntary manslaughter, we note that there are two crucial differences between the "implied malice" murder found here, and voluntary manslaughter. First, intent to kill is an essential element of voluntary manslaughter, but not of second degree murder under an implied malice theory. Because we have some unusual insight into the jury deliberations in this case, we know that the jurors struggled mightily with the issue of appellant's mens rea with respect to the killing of Garcia and may have rejected the prosecution evidence of intent to kill. Second, we presume the jury followed the court's instructions and did not consider the evidence of voluntary intoxication with respect to the issue of "implied malice" but that, given a chance to do so, it would be free to find that voluntary intoxication negated the "intent to kill" required for voluntary manslaughter. (See § 22, subd. (b).) If it so found, the only supportable verdicts would be involuntary manslaughter or an acquittal. (People v. Saille (1991) 54 Cal.3d 1103, 1116-1117, 2 Cal.Rptr.2d 364, 820 P.2d 588.) At bottom, the problem with respondent's argument for rehearing is that the second degree murder verdict in this case did not definitively resolve either of these issues.
[12] As delivered to the jury in this case, CALJIC No. 2.11.5 provides: "There has been evidence in this case indicating that a person other than the defendant was or may have been involved in the crime for which the defendant is on trial. [¶] There may be many reasons why that person is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted. Your sole duty is to decide whether the People have proved guilt of the defendant at trial."
[13] As we are reversing appellant's conviction of second degree murder because of the prejudicial jury misconduct in this case, we need not decide whether Mendoza also provides a basis for relief on that charge.
[14] We note that several of the claims of sentencing error raised in the habeas petition in the present case are virtually identical to those raised in a related appeal and habeas, respectively Nos. A082499 and A087215 (collectively Somersall II), arising from a conviction for sodomy in jail, an offense which occurred on September 27, 1997, in the middle of trial in the instant case (Somersall I). In a separate opinion filed concurrently with this one, we have affirmed the judgment of conviction in Somersall II but remanded for resentencing because the trial court in that case took account of the murder/robbery/ assault convictions in this case when it refused to strike either of appellant's priors or reduce the sodomy charge to a misdemeanor, and when it decided to run the Somersall II sentence consecutively to the sentence in Somersall I. Thus, the claims of sentencing error raised in the habeas petition in Somersall II have also been rendered moot.